UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

FRANCISCO CORTES,

       Plaintiff

v.

TWENTY-FIRST CENTURY FOX AMERICA, INC., 21ST CENTURY FOX AMERICA, INC., TWENTY-FIRST CENTURY FOX, INC.

John Doe, Jane Doe

       Defendants

-------------------------------------------------------X

Case Number: 1:17-cv-05634-RWS

## AMENDED VERIFIED COMPLAINT
## JURY TRIAL DEMANDED

PLAINTIFF FRANCISCO CORTES, by and through his undersigned attorneys The Law Office of J.A. Sanchez-Dorta, P.C., hereby alleges as follows, with all allegations made upon information and belief:

### PRELIMINARY STATEMENT

1. Plaintiff Francisco Cortes ("Mr. Cortes"), a former employee of Twenty-First Century FOX America, brings this action against Defendants FOX, John Doe and Jane Doe (collectively, the "Defendants") for Fraud, Conspiracy to Commit Fraud, Breach of Contract, Intentional Interference with Contractual Relations, Defamation Per Se, Libel Per Se, and Slander Per Se.

### PARTIES

2. Plaintiff Mr. Cortes ("Mr. Cortes") is a natural person, domiciled in New Jersey.

1

3. Defendants 21ST CENTURY FOX AMERICA, INC., AKA TWENTY-FIRST CENTURY FOX AMERICA, INC., and TWENTY-FIRST CENTURY FOX, INC. (together, "FOX") are Delaware corporations, each of which are domiciled and/or doing business in New York, New York as a foreign corporation.

## VENUE AND JURISDICTION

4. This Court has subject matter jurisdiction over this action pursuant to diversity of citizen jurisdiction under 28 U.S.C. § 1332. For purposes of diversity of citizenship jurisdiction, Mr. Cortes is a New Jersey citizen, the amount in controversy well exceeds the statutory limit, exclusive of interest and costs, and FOX is a Delaware Citizen domiciled and/or doing business in New York. This Court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

5. Venue in this Court is proper under 28 U.S.C. § 1391 (b) because a substantial part of the events or omissions giving rise to the claims occurred in this Judicial District and/or because FOX' business is predominately located in this Judicial District.

## FACTUAL BACKGROUND
## SUMMARY OF FACTUAL BACKGROUND

6. Mr. Cortes brings this Complaint for Fraud, Conspiracy to Commit Fraud, Breach of Contract, Intentional Interference with Contractual Relations, Defamation Per Se, Libel Per Se, and Slander Per Se based upon the following allegations.

7. In February of 2017, FOX, Tamara Holder, Mr. Cortes, and *two other* presently (to Mr. Cortes, but not to the Defendants) UNKNOWN PERSONS (hereinafter,

the "UNKNOWN PERSONS") signed The Tamara Holder and TWO UNKNOWN PERSONS Agreement (hereinafter, "The Tamara Holder and TWO UNKNOWN PERSONS Agreement"). Mr. Cortes signed The Tamara Holder and TWO UNKNOWN PERSONS Agreement (only presented to him in a redacted form, eliminating the identity of the UNKNOWN PERSONS, which he via his attorney was led to believe by attorneys for FOX, Paul Weiss [falsely, in an intentional effort to mislead him] was done solely to protect and shelter from his knowledge the UNKNOWN PERSONS' identity) because it, in exchange for Mr. Cortes agreeing not to disparage FOX and Tamara Holder, obligated Tamara Holder and FOX not to disparage him regarding allegations (which Mr. Cortes vehemently denies the truth of, and will provide evidence as to the falsity of the allegations, and as to the fact that the relationship between Mr. Cortes and Tamara Holder was consensual, at trial on this Complaint, which evidence will include emails, text messages, with photos, and other supporting documentation), made against him by Tamara Holder in a complaint submitted by her attorney, Lisa Bloom, to FOX attorneys, Paul Weiss.

8. Nevertheless, a mere two weeks later, Tamara Holder and FOX delivered a previously planned and carefully negotiated joint statement to the New York Times regarding the allegations, in violation of their obligations under The Tamara Holder and TWO UNKNOWN PERSONS Agreement, destroying Mr. Cortes' reputation, irreparably damaging his career opportunities, and intentionally and/or with reckless disregard hurting his family. They did this knowing that Mr. Cortes would, due to his own contractual obligations pursuant

to The Tamara Holder and TWO UNKNOWN PERSONS Agreement, be forced to either violate those obligations, inviting litigation (which the Defendants, given FOX' and the Murdochs' wealth, and Tamara Holder's recently awarded $2.5 Million pursuant to The Tamara Holder and TWO UNKNOWN PERSONS Agreement, were far better financially equipped to handle than the unemployed Mr. Cortes), or remain silent before a national/international press onslaught against him regarding the allegations, which he vehemently denies, but could not then deny via the press because his hands had been tied by The Tamara Holder and TWO UNKNOWN PERSONS Agreement, his signature on which had been secured via intentional misrepresentations made by FOX and their attorneys, Paul Weiss, in conspiracy with Tamara Holder.

9. FOX and their attorneys, Paul Weiss, and Tamara Holder intentionally misrepresented their intentions regarding their desire to comply with their contractual obligations pursuant to The Tamara Holder and TWO UNKNOWN PERSONS Agreement, thus deceiving Mr. Cortes into signing The Tamara Holder and TWO UNKNOWN PERSONS Agreement, which he had signed, in its redacted form (eliminating the identity of the UNKNOWN PERSONS), because doing so would have protected him against anything other than an intentional breach by FOX and Tamara Holder of the contractual obligations set forth in The Tamara Holder and TWO UNKNOWN PERSONS Agreement, and because he hoped, ultimately, in vain, that doing so would have allowed him to put the damaging matter of Tamara Holders' false allegations behind him, sheltering his reputation, career opportunities, and, most importantly, his family

from the damage that would inevitably be incurred from a vigorous fight against the well-healed and influential Defendants to defend himself against Tamara Holder's false allegations.

10. Mr. Cortes has, thus, served as a useful "scapegoat" ("Patsy") for FOX to help it demonstrate that it aggressively handles sexual harassment complaints, as part of a carefully orchestrated plan to permit the Murdochs to eliminate concerns in the U.K. regarding their $15.2 Billion acquisition of Sky in the U.K., and to protect the identity and shelter the reputations of *the two* UNKNOWN PERSONS who, it must be assumed, were, unlike Mr. Cortes, not Latino, and not financially insignificant to FOX.

11. The persons whose names were redacted from the version of The Tamara Holder and UNKNOWN PERSONS Agreement provided to Mr. Cortes, interestingly enough, were not cited by Ms. Holder or FOX in their statements released in the March 8th New York Times Article.[1]

12. This calls into question the sincerity and veracity of the joint statement by Ms. Holder and FOX, as well as the March 8th New York Times Article delivering that joint statement to the international news media, which article painted FOX in a positive light regardless of the documentation provided to the reporter.

13. Regardless, the efforts to hide the identity of the UNKNOWN PERSONS accused by Tamara Holder are not based upon considerations of privacy or respect for contractual law (as the Defendants demonstrated no respect for the same regarding Mr. Cortes). Whoever these persons are, these UNKNOWN PERSONS

---

[1] https://www.nytimes.com/2017/03/08/business/FOX-news-roger-ailes-sexual-assault-settlement.html

were intentionally protected, for some reason, and Mr. Cortes will not know what reason that is until disclosure reveals the identity of the UNKNOWN PERSONS and, at that time, Mr. Cortes will move to amend the Complaint, perhaps to include the cause of action of racial discrimination if those persons are not Hispanic, among other potential causes of action.

14. All of the above was done as part of an intentional and well orchestrated plan in collaboration with others, including, without limitation, a reporter from the New York Times, Emily Steele, who has previously been employed with the Wall Street Journal (she identifies herself as a "WSJ Alum"), a News Corporation entity, which is owned by the Murdochs, who also own FOX. This New York Times reporter, Emily Steele, was provided in advance the joint statement by FOX and Tamara Holder, and given an "exclusive" on the story of Tamara Holder's allegations, permitting her to "break" the story in a fashion acceptable to FOX and the Murdochs via the March 8th New York Times Article (as defined below).

15. Moreover, Mr. Cortes has served as a useful "scapegoat" to Tamara Holder, who has since the March 8th New York Times Article gone to extreme lengths (attacking her attorneys and agents, alleging misconduct by them and/or a betrayal of victims of sexual harassment) to cynically paint herself as the "Poster Child" for bravery against sexual harassment, although *she has protected the identity, thus, sheltering their reputations from the taint of a sexual harassment scandal, of not one, but two people* other than Mr. Cortes who have signed The Tamara Holder and UNKNOWN PERSONS Agreement regarding her allegations of

sexual harassment. These two UNKNOWN PERSONS, it must be assumed, were, unlike Mr. Cortes, not Latino, not financially insignificant to FOX, and not without some utility to Tamara Holder's career if she would only agree to continue to protect them and shield their reputations from the damage necessarily incurred by accusations of sexual harassment.

16. This was done as part of an intentional plan in collaboration with others, including a former employee of the Wall Street Journal ("WSJ Alum"), a reporter from the New York Times, Emily Steele, who has been collaborating with Tamara Holder since July of 2016, for an article which was only submitted ("breaking" the story of Tamara Holder's false allegations against Mr. Cortes) on March 8th, 2017, entitled "FOX Is Said to Settle With Former Contributor Over Sexual Assault Claims" (hereinafter, the "March 8th New York Times Article"). Although Emily Steele and Tamara Holder have been working together since July of 2016, and Ms. Steele was provided in advance, and to the exclusion of all other reporters, both a copy of the joint statement by Tamara Holder and FOX (which had to have been carefully planned, negotiated over, and drafted by FOX, their attorneys' Paul Weiss, Tamara Holder, and her attorney, Lisa Bloom, some time in advance), and emails from Ms. Tamara Holder (which were, of necessity, carefully planned, negotiated over, and drafted by FOX, their attorneys, Paul Weiss, Tamara Holder, and her attorney, Lisa Bloom, well in advance), Mr. Cortes and his attorney were only contacted for their comment on the morning of March 8th, 2017, in an intentional effort to "blind-side" and "outflank" them.

17. As Emily Steele was forced to "go to press" without Mr. Cortes and his attorney's comment, who failed to fall for the ruse of FOX attorneys, Paul Weiss, to convince them to make an unprepared and unadvisable statement to Emily Steele and the New York Times, which would have placed Mr. Cortes equally in violation of his contractual obligations with FOX and Tamara Holder, there were necessarily, two versions of the March 8th New York Times Article, that is, the one without his or his attorney's comment, and a later version, after the breach by Tamara Holder and FOX' breach of their contractual obligations with Mr. Cortes, in which Mr. Cortes states simply that his client is "considering his legal options".

18. Since the second version of the March 8th New York Times Article replaced the first version on both the internet and the printed New York Times, Mr. Cortes' attorney requested from Emily Steele, for the sake of demonstrating FOX and Tamara Holder's breach of their contractual obligations, the first version of the March 8th New York Times Article and, although Ms. Steele agreed she would provide him with a copy of the first version, she merely provided him a copy of the second version of the March 8th New York Times Article, thus, assisting FOX and Tamara Holder in their efforts to avoid their liability for their violation of their contractual obligations to Mr. Cortes.  Fortunately, however, Mr. Cortes' attorney was able to secure, through alternative means, a copy of the first version of the March 8th New York Times Article, which may be compared to the second, presently existing version of March 8th New York Times Article, which comparison will be utilized to demonstrate that FOX and Tamara Holder intentionally breached their contractual obligations to Mr. Cortes, that the New

York Times has treated Mr. Cortes unfairly and in violation of its ethical obligations, and that Mr. Cortes has had no alternative but to defend himself against the acts of the Defendants and their co-conspirators.

## ALLEGED FACTS RELATED TO ALL CAUSES OF ACTION

19. On a date previous to January 1, 2017 (date presently unknown to Plaintiff), Tamara Holder, a contributor at FOX, had her attorney Lisa Bloom deliver a complaint to FOX naming Francisco Cortes, and the UNKNOWN PERSONS, suing FOX for sexual harassment.

20. The matter was ultimately resolved (as far as Mr. Cortes and his attorney was led to believe by FOX and its attorneys, Paul Weiss) via the execution of The Tamara Holder and TWO UNKNOWN PERSONS Agreement by and between all the parties (including the UNKNOWN PERSONS) in late February of 2017.

21. The Tamara Holder and TWO UNKNOWN PERSONS Agreement, executed by Tamara Holder, Francisco Cortes, and, upon information and belief, FOX News and the two UNKNOWN PERSONS provided, in part, as follows, agreed to by Tamara Holder:

    "I HAVE ELECTED TO EXECUTE THIS AGREEMENT, TO FULFILL THE PROMISES SET FORTH HEREIN, AND TO HAVE THE COMPANY PAY ME THE CONSIDERATION REFERRED TO IN THE AGREEMENT. I FREELY AND KNOWINGLY, AND AFTER DUE CONSIDERATION VOLUNTARILY ENTER INTO THIS AGREEMENT INTENDING TO WAIVE, SETTLE AND RELEASE ALL CLAIMS I HAVE OR MAY HAVE AGAINST THE RELEASED PARTIES UP TO THE PRESENT, EXCEPT AS PROVIDED IN PARAGRAPH 10."

22. Mr. Cortes' counsel received assurances from FOX' attorneys Paul Weiss that the exception of Paragraph 10 referred to only requests by governmental authorities for information, that Mr. Cortes was one of the Released Parties as the Cortes Released Parties, and Mr. Cortes signed The Tamara Holder and TWO UNKNOWN PERSONS Agreement based upon those representations, relying upon the same.

23. These assurances were made by telephone, as FOX's counsel at Paul Weiss often insisted on avoiding, as much as possible, stating anything in an email [oral statements are difficult to prove]. Even on the night of the March 8th New York Times Article, as FOX's counsel at Paul Weiss attempted unsuccessfully to convince Mr. Cortes' attorney to make a hastily prepared statement to the press in response to their carefully negotiated and prepared joint statement (which, if such hastily prepared statement had been made at the same time of the joint statement for the first version of the March 8th New York Times Article, would have placed Mr. Cortes in violation of his contractual obligations to the same extent as FOX and Tamara Holder, thus, tying his hands in a future litigation against them [that is, the instant litigation]) they responded to an email from Mr. Cortes' counsel with a telephone call, left a voice mail message for him to call them, and when Mr. Cortes' counsel asked them by email to inform him by email what they wanted, they sent an email in which they insisted on speaking by telephone, refusing to respond by email.

24. It is significant to note, as an aside, that the email by Mr. Cortes' counsel which Fox Counsel at Paul Weiss refused to respond to by email, on the night of March 8th, 2017, a date well prior to the increasingly public accusations of racial discrimination at FOX, stated (in response to the notification that FOX and Tamara Holder were going to violate their obligations pursuant to The Tamara Holder and TWO UNKNOWN PERSONS Agreement):

"Moreover, as I explained to you, it is my view that my client is a young Latino man who was played (scapegoated) both by your client and the accuser, and if your client, and the accuser, want to go there, we can go there too, *eventually*. All the best, Jay" [Italics added]

25. FOX counsel at Paul Weiss, in response to this email, simply left a voice mail message on March 8, 2017, at 7:01 pm, stating, "Hey, Jay, its [Name Redacted, to be provided during the disclosure process], um, I got your email, I want to confirm I have received them, um, I did want to flag one additional point to you, so, if you get this message, you know, please, if you can call [Name Redacted, to be provided during the disclosure process] at [Phone Number redacted] then she can conference me in. Take care, bye." Apparently, FOX counsel was eager to, once again, make a thinly veiled threat to Mr. Cortes' severance payments (off the record, of course) to intimidate him against filing suit against them.

26. The Tamara Holder and TWO UNKNOWN PERSONS Agreement further provided that:

"(c) Cortes, on behalf of himself and the Cortes Released Parties, hereby knowingly and voluntarily releases and discharges the Holder Released Parties from any and all Claims whatsoever in law, admiralty or equity, whether now known or unknown, suspected or unsuspected, vested or contingent, accrued or yet to accrue, against the Holder Released Parties which Cortes had, has, or hereafter can, shall or may have up until Effective Date."

27. The Tamara Holder and TWO UNKNOWN PERSONS Agreement further provides that:

"12. **Non-Disparagement.** Holder agrees not to disparage, malign, or defame any Released Party, or to publish or cause to be published any statements portraying any Released Party in an unfavorable light. The Company, **[Name Redacted]** and Cortes agree not to disparage, malign or defame Holder, or to publish or cause to be published any statements portraying Holder in an unfavorable light. A statement by a Party that violates this provision subjects that Party to liquidated damages under Paragraph 11 (n) of this Agreement." [Emphasis Added]

28. It is significant to note that the portion of Paragraph 12 of The Tamara Holder and TWO UNKNOWN PERSONS Agreement has a redacted surname, which,

apparently, is only five to seven letters long, given the length of the blackened space.

29. The unredacted version of The Tamara Holder and TWO UNKNOWN PERSONS Agreement (attached hereto as Exhibit B) also has a signature page with a space for Tamara Holder's signature, Twenty-First Century Fox' signature, Francisco Cortes' signature, and *apparently, two wholly redacted spaces* for the signature of the two UNKNOWN PERSONS.

30. Although the redacted portion of Paragraph 12 of The Tamara Holder and TWO UNKNOWN PERSONS Agreement has space for only one name, and there are two redacted signature spaces on the signature page of The Tamara Holder and TWO UNKNOWN PERSONS Agreement, this inconsistency would be explained by the fact that the redacted version provided to Mr. Cortes of The Tamara Holder and TWO UNKNOWN PERSONS Agreement (attached hereto as Exhibit B) contains several completely redacted paragraphs, suggesting that one of the UNKNOWN PERSONS whose name is redacted from the signature page had an entire portion of The Tamara Holder and TWO UNKNOWN PERSONS Agreement dedicated solely to that UNKNOWN PERSON. This would suggest that this particular UNKNOWN PERSON who FOX and Tamara Holder have, fraudulently and conspiracy with one another (and others, to be named as disclosure proceeds in the instant matter) protected the identity of (shielding that UNKNOWN PERSON's reputation from the taint of a sexual harassment scandal) had a great deal of power and influence at FOX, as well as a group of very

sophisticated attorneys who were able to expertly wield that influence on his behalf.

31. The Tamara Holder and TWO UNKNOWN PERSONS Agreement was signed by Tamara Holder on 2/18/17, and by Francisco Cortes on 2/22/17, to be signed by FOX. The date of its execution by the UNKNOWN PERSONS is presently, to Mr. Cortes, unknown.

32. This document was drafted by FOX's attorneys Paul Weiss, with the input of the attorneys of Tamara Holder and the two UNKNOWN PERSONS (Mr. Cortes and his attorney were not permitted any input and were not even permitted to view a complete unredacted version of The Tamara Holder and TWO UNKNOWN PERSONS Agreement), and Paul Weiss also controlled and handled the separate execution of the same by all parties.

33. Mr. Cortes executed The Tamara Holder and TWO UNKNOWN PERSONS Agreement, forcing him to remain silent against the allegations, which he vehemently denies (and intends to provide evidence as to their falsity, and as to the fact that the relationship between Mr. Cortes and Tamara Holder was consensual at trial on this Complaint, which will include emails, text messages and photos, and other supporting documentation), because The Tamara Holder and TWO UNKNOWN PERSONS Agreement (even given the redacted form provided to him, given the representations of FOX' attorneys Paul Weiss) would, in its non-redacted form (presently in the possession of the Defendants), protect him against anything other than an *intentional breach* of the contractual

obligations set forth in The Tamara Holder and TWO UNKNOWN PERSONS Agreement.

34. Also, it is interesting to note that, apparently, in her efforts to maintain her relevancy, and to cynically paint herself as a victim of sexual harassment, there is no one whose reputation she is not willing to attack – the lawyer who gained her a $2.5 Million windfall for a false accusation of sexual harassment, and even the agents who in good faith made statements to her in an attempt to protect her career against the onslaught of the, at that time, seemingly invincible FOX and Murdochs, who, as Mr. Cortes has learned, remain highly dangerous and willing to use their power to advance their interests.

35. Moreover, Mr. Cortes wanted to avoid further damage to his career and his family and hoped, in vain, ultimately, that executing The Tamara Holder and TWO UNKNOWN PERSONS Agreement, would allow him to put the damaging matter of Tamara Holder's false allegations behind him (and it would have, if FOX and Tamara Holder had not intentionally, as part of a fraudulent conspiracy against him, not breached their obligations under The Tamara Holder and TWO UNKNOWN PERSONS Agreement).

36. In fact, Mr. Cortes never really had a hope of achieving this goal which the Defendants had dangled before him to convince him to sign The Tamara Holder and TWO UNKNOWN PERSONS Agreement, because FOX, the Murdochs, and their attorneys at Paul Weiss wanted Tamara Holder to breach The Tamara Holder and TWO UNKNOWN PERSONS Agreement, and paid her $2.5 Million to do so (and to not reveal the other person who signed The Tamara Holder and TWO

UNKNOWN PERSONS Agreement), so that she could make with them the joint statement against Mr. Cortes that was reported in the March 8th New York Times Article, exonerating them, in the eyes of the world, of the sexual harassment scandal.

37. Significantly, before the March 8th New York Times Article, Mr. Cortes was in conversations with three major networks for a possible role for him with each of these, and each of these potential employment opportunities evaporated after the publication of the March 8th New York Times Article. Regarding the first major network, he personally met with a Senior Executive in midtown after sending him his resume. They discussed possible roles within their organization with a focus on editorial and Corporate Social Responsibility. After the March 8th New York Times Article was published all conversations halted, with no response or any follow up from that major network. Regarding the second major network, before the March 8th New York Times Article was published, he spoke with a senior recruiter for the company regarding a Vice President of Community affairs position. The interview went great but again after the March 8th New York Times Article was published that major network never followed up with Mr. Cortes. Regarding the third major network, Mr. Cortes had a phone interview before the March 8th New York Times Article was published with a senior recruiter for North America in regards to a Senior position with the company. The interview went great, but again after the March 8th New York Times Article was published no further communication was had between Mr. Cortes and that major network.

38. Mr. Cortes has served as a useful and relatively inexpensive "Patsy" for FOX to help it demonstrate that it has aggressively handled sexual harassment complaints, so that the Murdochs might eliminate concerns in the U.K. regarding their acquisition of Sky in the U.K., and FOX might protect the two UNKNOWN PERSONS.

39. In sum, FOX, with the assistance and upon the advice of their outside legal counsel, Paul Weiss, determined as follows: by paying Tamara Holder $2.5 Million (an amount which is for them a miniscule amount of money) under The Tamara Holder and TWO UNKNOWN PERSONS Agreement, and by potentially having to pay Tamara Holder under any indemnification arrangement FOX might have with her to protect her from her intentional breach of The Tamara Holder and TWO UNKNOWN PERSONS Agreement with Mr. Cortes (a copy of which might be obtained through disclosure pursuant to this Complaint), which intentional breach they had planned well in advance of the execution of The Tamara Holder and TWO UNKNOWN PERSONS Agreement (and as part of their well orchestrated plan calculated that they might limit their exposure under any such indemnification agreement with Tamara Holder by limiting damages to be paid by Tamara Holder for any breach of her contractual obligations with Mr. Cortes under The Tamara Holder and TWO UNKNOWN PERSONS Agreement to a sum certain of "Liquidated Damages", so that Mr. Cortes might not be able to request in a potential lawsuit any more than the Liquidated Damages in the event of Tamara Holder's breach and she, thus, would not request indemnification from FOX in a sum higher than the amount of the Liquidated Damages), FOX and the

Murdochs could inexpensively "kill two birds with one stone". FOX and the Murdochs could "whitewash" their image to portray themselves as persons concerned with combatting sexual harassment in the workplace, in order to secure the Sky takeover deal and their advertising revenues, and they could also protect the two UNKNOWN PERSONS, sheltering the UNKNOWN PERSONS' reputations from the negative impact of a sexual harassment scandal, through FOX and the Murdochs inexpensive and risk-free (after all, they reasoned, how would an unemployed Mr. Cortes ever dare to litigate against FOX and the Murdochs, with their army of sophisticated lawyers, dangerous private investigators, and aggressive and influential network of sycophants employed in the national and international news media, persons who are former employees of News Corporation, FOX and/or the Murdochs, or hope to be future employees of News Corporation, FOX and/or the Murdochs) sacrifice of a financially insignificant Latino "Patsy".

40. Moreover, the Defendants intended to have Mr. Cortes serve as a useful "scapegoat" to Tamara Holder, who has since the March 8th New York Times Article gone to extreme lengths (even attacking her attorneys and agents, alleging misconduct by them and/or a betrayal of victims of sexual harassment) to cynically paint herself as the "Poster Child" for bravery against sexual harassment, although *she has protected not one, but two other people* who have signed The Tamara Holder and TWO UNKNOWN PERSONS Agreement. These two UNKNOWN PERSONS, it must be assumed, were, unlike Mr. Cortes, not Latino, not financially insignificant to FOX, and not without some utility to

Tamara Holder's career if she would only agree to continue to protect them and shield their reputations from the damage necessarily incurred by accusations of sexual harassment.

41. The decision to "scapegoat" Mr. Cortes, was based, in part, on a willingness of FOX executives and the Murdochs to subscribe to a stereotype of the Hispanic man, and, in part, on their belief that anyone who was informed of the incident (for example, the public in general, due to the subsequent joint statement made by FOX and Tamara Holder, in violation of their respective contractual obligations with Mr. Cortes, and due to the "March 8th New York Times Article") would be willing to subscribe to this stereotype of the Hispanic man[2].

42. FOX intended, ultimately, to "scapegoat" Mr. Cortes in order to cleanse FOX of the taint caused by the recent sexual harassment scandal being faced by FOX, which was to be a significant obstacle to their retention of advertising revenue, and to their $15.2 Billion takeover of European pay-TV group Sky. *See, for example*, "FOX News Troubles Heighten Scrutiny of Rupert Murdoch's Plan to Acquire Sky", Mark Scott, the New York Times, April 9, 2017:

---

[2] The textbook "Sociology: Understanding a Diverse Society," provides some insight into how, given the Hispanic stereotype, Mr. Cortes might be the ideal "Patsy" for FOX, Rupert Murdoch, James Murdoch, and Tamara Holder:

"there is interplay between race and gender stereotypes…Gender and race together create stereotypes of different groups of men and women. African American men are stereotyped as hypermasculine and oversexed…Hispanics are stereotyped as macho and, like African American men, sexually passionate…Hispanic men, for example, bear the stereotype of *machismo* – exaggerated masculinity. Machismo is associated with sexist behavior by men…" (Sociology: Understanding a Diverse Society, Updated, by Margaret L. Andersen, Howard F. Taylor, Cengage Learning, Feb 22, 2007, Chapter 12, "Gender", page 312.)